**INDIANA PORT COMMISSION,**
Appellant/Defendant,

v.

**CONSOLIDATED GRAIN AND BARGE CO.,** Appellee/Plaintiff,

and

**ConAgra, Inc., Intervenor/Appellant.**

No. 49A02–9712–CV–832.

Court of Appeals of Indiana.

Nov. 17, 1998.

Michael A. Wukmer, John J. Morse, Ice Miller Donadio & Ryan, Indianapolis, for Indiana Port Commission.

Steven G. Cracraft, Stacy L. Dimitri, McHale, Cook & Welch, P.C. Indianapolis, James P. Fitzgerald, McGrath, North, Mullin, & Kratz, P.C., Omaha, NE, for ConAgra, Inc.

Peter M. Racher, Christopher J. Braun, Thomas A. John, Plews Shadley Racher & Braun Indianapolis, for Consolidated Grain and Barge Co.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

The Indiana Port Commission and ConAgra, Inc. appeal the trial court's grant of Consolidated Grain and Barge, Inc.'s motion for a preliminary injunction.

We reverse.

### ISSUE [1]

Whether the trial court erred in granting Consolidated's motion for a preliminary injunction.

### FACTS [2]

The Indiana Port Commission ("the Commission"), a "body both corporate and politic," Ind.Code 8–10–1–3, was created by the legislature to "promote the agricultural, industrial and commercial development of the state" through the development and operation of public ports. Ind.Code 8–10–1–1. The Commission is "authorized and empowered ... [t]o lease to others for development or operation such portions of any port or port project, on such terms and conditions as the commission shall deem advisable." Ind.Code 8–10–1–7(11). The Commission is also "authorized to lease, or grant options to lease, to others for development any portion of the land owned by the commission, on such terms as the commission shall determine to be advantageous." Ind.Code 8–10–1–10. "[T]he exercise by the commission of the powers conferred by [Ind.Code 8–10–1 *et seq.*] in the construction, operation and maintenance of a port project shall be deemed and held to be essential governmental functions of the state...." Ind.Code 8–10–1–3.

The Commission owns and operates three public ports in the State, including Southwind Maritime Centre ("Southwind"), a 742 acre industrial complex on the Ohio River in Posey County. Southwind's infrastructure includes piers and moorings, roads, cranes, and approximately 6.5 miles of railroad tracks, including three north-south segments of track located in the northwest quadrant of Southwind which are used for the storage of

1. Because we find that the trial court erred in granting the preliminary injunction, we need not address the Commission's additional argument that the trial court's conditional dissolution of the preliminary injunction was the "functional equivalent of a new injunction." The Commission's Brief, p. 45.

2. We held oral argument in Indianapolis on September 22, 1998.

railroad cars.[3] ("Storage Tracks"). The Storage Tracks provide storage capacity for approximately 90 rail cars. The railroad service to and inside Southwind is provided by CSX Transport, whose track passes immediately north of Southwind.

Several businesses, including Consolidated Grain and Barge, Inc., ("Consolidated"), MAPCO Coal Sales, Inc., ("MAPCO"), and IMC AgriBusiness, Inc., ("IMC"), lease space at Southwind and pay annual tariffs and wharfage fees to the Commission for the use and maintenance of Southwind's equipment and infrastructure. Southwind's tenants are permitted to use its developed Ohio River frontage for the purposes of loading grain, fertilizer, soybeans, coal and other cargo to and from trucks, railroad cars and barges.

Consolidated, which entered into its first lease with the Commission in 1979, and became one of Southwind's first tenants, is a wholly owned subsidiary of Itochu and Zen-Noh, two foreign agricultural trading companies with approximately $300 billion in annual sales, $80 billion in assets and $17 billion in equity between them. Consolidated operates a grain elevator and related facilities at Southwind. In the spring and summer of 1995, Consolidated considered entering the soybean processing business, which included the production of unrefined crude soybean oil, soybean meal and soybean hulls from crushed soybeans. These commodities can be sold for further processing. Consolidated selected Southwind as the site for its soybean processing facility, which was expected to cost $30 million to construct and have the capacity to crush 22 million bushels of soybeans annually.

During the same time period, ConAgra, Inc. ("ConAgra") also considered entering the soybean processing business. ConAgra is a diversified company based in Omaha, Nebraska. It is the second largest food processing company in the United States with annual sales in excess of $23 billion and is listed among the nation's Fortune 100 corporations. ConAgra also selected Southwind as a possible site for its soybean processing

facility, which is projected to cost $170–200 million to construct and which will have the capacity to crush 66 million bushels of soybeans annually. The proposed ConAgra facility is different from the proposed Consolidated facility in many respects. In addition to being substantially larger, the proposed ConAgra facility will refine the soybean oil for consumer use and package it for sale.

At the time, neither Consolidated nor ConAgra had a soybean processing facility in the United States, and each company saw the benefits of the Southwind location. Specifically, Southwind, which is accessible by train, truck and barge, is located in an area with a plentiful supply of soybeans and access to purchasers of soybean products.

On November 27, 1995, at a public meeting, the Commission granted both Consolidated and ConAgra options to lease land at Southwind to construct and operate soybean processing facilities. Consolidated received an option on approximately seven acres of land adjacent to its existing leased property. ConAgra received an option on approximately 88 acres in the northwest quadrant of Southwind, including the property which contained the existing Storage Tracks. Despite prior discussions between Consolidated and ConAgra regarding the competition at Southwind, neither company objected to the Commission's grant of the options to the other. However, Consolidated apparently believed that if it announced its plans to open a facility at Southwind, it would be able to "discourage any potential competitors with similar ideas," (R. 952–53), including ConAgra.

On June 1, 1996, the Commission and Consolidated entered into a lease agreement which allowed Consolidated to continue to operate its existing facilities and to construct and operate a soybean processing facility. In July 1996, ConAgra publicly announced that it had selected Southwind as the site for its soybean processing facility. That same month, Consolidated learned that ConAgra's proposed leasehold included the Storage Tracks. Charles Threlkeld, the General

---

3. Southwind is the only public port operated by the Commission which has a rail storage yard within the port for complimentary use by its

tenants. Tenants at the other public ports must rely on the railroad serving those ports to coordinate traffic and to stage and store rail cars.

Manager of Rail Transportation and Bulk Sales for Consolidated, immediately contacted Donald Snyder, Port Director at Southwind, and told him that on-going use of the storage tracks was essential to Consolidated's operations. Snyder told Threlkeld that Southwind would provide Consolidated with comparable storage tracks at another location in Southwind.

In the fall of 1996, Snyder met with other Port tenants to discuss the location of new storage tracks. The Commission also hired a rail expert, James Wilson, to provide rail consulting services to the Commission regarding the location of new storage tracks. Wilson examined the rail services provided by CSX in light of Southwind's expected growth. He also visited Southwind several times and reviewed drawings and photographs of Southwind. Wilson selected and analyzed 14 different sites at Southwind for the location of new storage tracks, and then recommended one.

After the Commission announced the proposed new location site, Consolidated filed a "Complaint for Declaratory Judgment, Preliminary and Permanent Injunctive Relief and for Damages" wherein it alleged that the "decision to eliminate access to the [storage] tracks violates express and implied agreements with Consolidated ..., as well as the [Commission's] duly promulgated rules ... and should be enjoined." (R. 4, 5). The trial court held hearings on Consolidated's motion for a preliminary injunction and subsequently entered an order granting the injunction. Specifically, the trial court preliminarily enjoined the Commission "from taking any action to eliminate, curtail, or otherwise restrict Consolidated ... from access to the existing railroad Storage Tracks at the Port," and "from entering into a lease with ConAgra or other prospective tenants until after the issues concerning a workable rail plan including comparable rail storage space are remanded to the [Commission] for further consideration and resolution...." (R. 808).

*DECISION*

■ The Commission and ConAgra argue that the trial court erred in granting Consolidated's motion for the preliminary injunction.[4] We agree.

■ The grant or denial of a preliminary injunction rests within the equitable discretion of the trial court and will be reversed only upon a showing of abuse of discretion. *Northern Indiana Public Service Company v. Dozier*, 674 N.E.2d 977, 989 (Ind.Ct.App.1996). Nevertheless, the power to issue an injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly in the moving party's favor. *Id.*

■ In determining whether the trial court abused its discretion, we look to the trial court's findings of fact required by Ind. Trial Rules 65 and 52. *Id.* In determining whether an abuse of discretion exists, we determine whether the findings validly support the court's decision. *Id.* The findings will not be set aside unless clearly erroneous. *Id.* The findings are clearly erroneous when the record lacks any facts or reasonable inferences to support them. *Jay County Rural Electric Membership Corporation v. Wabash Valley Power Association, Inc.*, 692 N.E.2d 905, 908–09 (Ind.Ct.App.1998), *trans. denied.*

■ The trial court's discretion to grant or deny a preliminary injunction is

4. Consolidated contends that ConAgra "lacks standing to file a brief in this appeal...." Consolidated's Brief, p. 35. However, Consolidated has waived appellate review of this issue because it failed to challenge ConAgra's standing at trial. *See Stepp v. Duffy*, 686 N.E.2d 148 (Ind.Ct.App. 1997), *reh'g denied, trans. denied*, (party may not raise issue for the first time on appeal). Waiver notwithstanding, this argument is without merit. To establish standing, a party must demonstrate a personal stake in the outcome of the lawsuit and must show that it was in immediate danger of sustaining some direct injury as a result of the conduct at issue. *Hauer v. BRDD of Indiana, Inc.*, 654 N.E.2d 316, 318 (Ind.Ct.App.1995), *trans. denied.* Here, ConAgra has both demonstrated its personal stake and shown its immediate danger of sustaining direct injury. Specifically, because of the preliminary injunction, ConAgra has been unable to enter into a lease agreement with the Commission and begin construction of its proposed soybean processing facility.

measured by several factors: 1) whether the movant's remedies at law are inadequate, causing irreparable harm pending resolution of the substantive action; 2) whether the movant has demonstrated at least a reasonable likelihood of success at trial by establishing a prima facie case; 3) whether the threatened injury to the movant outweighs the potential harm the grant of the injunction would occasion upon the nonmovant; and 4) whether the public interest will be disserved. *Id.* If the movant fails to prove any one or more of these requirements, the trial court's grant of an injunction is an abuse of discretion. *Id.* We examine the trial court's findings and conclusions as they pertain to the pertinent factors.

## I. Adequacy of the Remedy at Law

The trial court concluded that Consolidated had no adequate remedy at law "on the rail issues [because] [t]he threatened harm to Consolidated from the [Commission's] decision to eliminate access to the railroad storage tracks will be on-going and incapable of a specific damages calculation." (R. 805). The Commission contends that this conclusion is erroneous because an "adequate remedy at law exists in the form of monetary damages." The Commission's Brief, p. 43. We agree with the Commission.

 The law is well-settled that a party which suffers "mere economic injury" is not entitled to injunctive relief because an award of post-trial damages is sufficient to make the party whole. *Id.; Xantech Corp. v. Ramco Industries, Inc.,* 643 N.E.2d 918, 921 (Ind.Ct.App.1994). Here, the evidence presented at the preliminary injunction hearings reveals that CSX currently leaves the rail cars on the Storage Tracks for Consolidated to load and unload at a subsequent time.[5] Without the tracks, Consolidated would have to load and unload the cars at the time that CSX delivered them. If the cars were not loaded and unloaded within a certain time

period, Consolidated might incur demurrage[6] charges.

Further, Consolidated currently stores rail cars on the Storage Tracks. Without the tracks, CSX would have to hold the cars in its storage yard in Evansville or on side tracks between Evansville and Southwind, and Consolidated might incur storage costs. In either case, Consolidated's injury would be merely economic, and an award of monetary damages would be sufficient to make it whole. Therefore, the trial court's conclusion regarding the inadequacy of a remedy at law is erroneous.

## II. Reasonable Likelihood of Success at Trial

The trial court also concluded that Consolidated had a reasonable likelihood of success at trial on two claims. First, the trial court concluded that the Commission "may be breaching its lease with Consolidated by denying Consolidated access to the railroad storage tracks without suitable alternatives." (R. 807). The Commission contends that this conclusion is erroneous because the "[l]ease unequivocally does not give [Consolidated] a right to . . . rail storage." The Commission's Brief, p. 29. We agree.

 A lease is interpreted in the same way as is any other contract. *Chesterfield Management, Inc. v. Cook,* 655 N.E.2d 98, 102 (Ind.Ct.App.1995), *reh'g denied, trans. denied.* The primary goal of contract interpretation is to give effect to the parties' intent. *Beiger Heritage Corp. v. Montandon,* 691 N.E.2d 1334, 1336 (Ind.Ct.App. 1998). Accordingly, when the terms of a contract are clear and unambiguous, they are conclusive and the court will not construe the contract or look to extrinsic evidence. *Id.* Rather, we will merely apply the contractual provisions. *Id.*

Consolidated directs us to three lease provisions which it claims supports its right to railroad storage. The first two provisions provide in pertinent part as follows:

5. Consolidated has its own locomotive which it uses to shuttle the cars back and forth to unload.

6. Charles Threlkeld, Consolidated's General Manager of Rail Transportation and Bulk Sales,

defined demurrage as a "charge from the railroad for the use or the lay time of their cars beyond whatever period it is...." (R. 1276).

*Section 1.01—The Demise.* The Commission ... does hereby demise and lease to Lessee ... the Old Property and the New Property ... together with

 (i) the non-exclusive right of ingress and egress to and from the nearest public road and to and from the Demised Premises over existing roads and railroad tracks within the Port, as such access may be changed from time to time by the Commission; and

 (ii) the non-exclusive right of ingress and egress to and from all public wharves serving the Port and the Demised Premises, over existing roads and railroad tracks within the Port, as such access may be changed from time to time by the Commission.

*Section 14.03—Maintenance of Public Facilities.* The Commission shall use reasonable efforts to provide rail and road access to the Demised Premises, utilizing existing infrastructure. The Commission reserves the right to relocate said facilities and/or modify them. Notwithstanding the foregoing, Lessee agrees to indemnify and hold the Commission harmless from any and all damage or injury resulting from Lessee's loading, unloading and any other use of the docks, wharves, berths, channels, waterways, roads and rail tracks. The Commission does not guaranty rail service to the Port and/or the Demised Premises.

(R. 896).

■ According to Consolidated, when taken together, these provisions "require the [Commission] to provide Consolidated with ingress and egress to and from the Demised Premises over the existing roads and tracks." Consolidated's Brief, p. 44. We agree with Consolidated's interpretation of these provisions. However, the Commission's obligation to provide Consolidated with ingress and egress has nothing to do with a purported obligation to provide storage tracks.

Consolidated also directs us to the following provision in its lease:

*Section 3.02—Additional Rental and Minimum Wharfage.*

(a) Lessee shall pay or cause to be paid to the Commission, either directly or through an authorized terminal operator ... the tariff charges specified in the Port Tariff ... Including the charges for "Lessee's Use" (as hereinafter defined) of the harbor, docks, wharves, appendant facilities, roads, railroad tracks and similar transportation facilities.... "Lessee's Use" shall include the use of the harbor, docks, wharves, appendant facilities, roads, railroad tracks and similar transportation facilities of the Commission by the Lessee, Lessee's customers and/or suppliers and/or by vehicles and vessels owned or chartered in connection with the delivery or transportation of materials, goods or products to and from the Demised Premises.

(R. 896).

According to Consolidated, this "provision demonstrates that the right to ingress and egress does not merely contemplate a brief entry and exit but rather all acts necessary [to] keep the requisite raw materials flowing to Consolidated and its products flowing to market." Consolidated's Brief, p. 45. We disagree with Consolidated's interpretation of the lease. According to the clear and unambiguous terms of this provision, Consolidated pays a fee for the use of certain of Southwind's facilities. However, storage tracks are not one of the enumerated facilities,[7] and we will not insert such a provision into the lease. *See General Motors Corp. v. Northrop Corp.,* 685 N.E.2d 127, 135 (Ind.Ct. App.1997), *reh'g denied, trans. denied* ("Courts do not have the power to create for the parties a contract which they did not make or to insert language into the contract which was not inserted by the parties.") Consolidated's argument that the language of the lease supports a breach of contract claim must fail.

Consolidated further posits that "Indiana law clearly recognizes that Consolidated's breach of lease claim is supported by additional theories besides the plain language of

---

**7.** Consolidated conceded at oral argument that the lease makes no reference to railroad storage tracks.

the lease." Consolidated's Brief, p. 47. First, Consolidated directs us to *Black v. Ervin*, 132 Ind.App. 470, 176 N.E.2d 142 (1961), for the proposition that "everything which belongs to the demised premises or is used with, and appurtenant to them and which is reasonably essential to their beneficial use and enjoyment passes as an incident to them...." *Id.* 176 N.E.2d at 144.

However, here, we cannot say that the Storage Tracks belonged to or are reasonably essential to the use and enjoyment of the demised premises. Specifically, Consolidated leased land from the Commission to build a soybean processing facility. The Storage Tracks are not essential to the beneficial use of this land. For example, Consolidated can bring in trucks, trains and barges to load and unload both processed and unprocessed soybeans. Consolidated can also store its products in rail cars in the CSX storage yard in Evansville, on tracks between Evansville and Southwind, or on the new storage tracks that the Commission proposed to build for it. Consolidated's argument lacks merit.

Consolidated further argues that "where a party has expended large sums of money in reliance upon the existence of a license granted by a subservient tenement, the subservient tenement cannot later revoke the license." Consolidated's Brief, p. 50. In support of its argument, Consolidated directs us to *Messick v. Midland Railway Company*, 128 Ind. 81, 27 N.E. 419 (1891); *Evansville & Terre Haute Railroad Co. v. Nye*, 113 Ind. 223, 15 N.E. 261 (1888); and *Lane v. Miller*, 27 Ind. 534 (1867). Consolidated has waived appellate review of this argument because it failed to raise it at trial. *See Stepp.*

Waiver notwithstanding, Consolidated's argument lacks merit. In *Messick, Lane,* and *Miller,* the licensee was given access to land owned by another and constructed a structure upon the land. Our supreme court found that the licensee could not subsequently be denied access to the structures. Specifically, in *Messick,* the court held as follows:

> An executed parol license to use another's land, granted upon a consideration, or upon the faith of which money has been expended, cannot be revoked. If the licen-

see, relying upon the grant, enters upon the premises, and expends considerable sums of money thereon, with the knowledge of the owner of the premises, such license cannot be revoked.

*Messick,* 27 N.E. at 420.

However, the facts before us are distinguishable from those in *Messick, Lane,* and *Miller.* Specifically, here, Consolidated did not construct or expend any funds on the Storage Tracks. Therefore Consolidated is not being denied access to a structure upon which it expended considerable sums of money. This argument, like the others regarding the breach of the lease, must fail. Therefore, the trial court's conclusion that Consolidated has a reasonable likelihood of success at trial because the Commission may be breaching its lease with Consolidated is erroneous.

The trial court also concluded that Consolidated had a reasonable likelihood of success at trial because the Commission's "actions violate 130 IAC 1–3–26(e) in that failure to provide adequate rail storage to Consolidated and other tenants will likely have an adverse impact on the economic viability of port operations." (R. 807).

Indiana Administrative Code 1–3–26 provides in pertinent part as follows:

> (a) Land is available for lease at port sites under the control of the Indiana Port Commission. Prospective tenants must meet the qualifications listed herein.

> &ast; &ast; &ast; &ast; &ast; &ast;

> (e) The prospective port tenant must provide evidence that the prospective tenant has adequate financial resources to undertake the proposed project. The prospective tenant must also show that the prospective tenant's proposed use of the port will not have a significant adverse impact on the economic viability of operations at the port.

The Commission contends that the "Trial Court erroneously interpreted 130 IAC 1–3–26(e) to require the [Commission] to provide rail storage to tenants." The Commission's Brief, p. 25. According to the Commission, "[b]y its very terms, 130 IAC 1–3–26(e) has *no* application at all to the [Commission's] determination to continue to provide rail

storage." The Commission's Brief, p. 26. We agree.

Rules of statutory construction are applicable to interpretation of administrative regulations. *State v. Carmel Healthcare Management, Inc.*, 660 N.E.2d 1379, 1386 (Ind.Ct.App.1996), *trans. denied.* The regulation is examined as a whole, and the language itself is scrutinized including the grammatical structure of the clause. *Elliott v. State*, 690 N.E.2d 774, 777 (Ind.Ct.App. 1998). In our analysis, we give words their common and ordinary meaning without unduly emphasizing a strict literal or selective reading of the individual words. *Id.* By reading the plain language of the regulation, we carry out our primary duty of giving effect to the intention of the administrative body that promulgated the rule. *Id.*

Here, the plain language of the regulation reveals that its purpose is to list requirements for prospective port tenants. One of the enumerated requirements is that the prospective tenant provide proof of adequate financial resources to undertake the project, and that its use of the port will not have a significant adverse impact on port operations. We fail to see how this regulation could require the Commission to provide rail storage to its tenants, and we find that the trial court's conclusion that Consolidated had a reasonable likelihood of success at trial because the Commission's actions "violate 130 IAC 1–3–26(e) in that failure to provide adequate rail storage to Consolidated and other tenants will likely have an adverse impact on the economic viability of port operations" is erroneous. (R. 807).

We recognize that the trial court made a Herculean effort in this case. However, Consolidated failed to show both an inadequate remedy at law and a reasonable likelihood of success at trial. A preliminary injunction was therefore inappropriate, *see Jay County,* and the trial court abused its discretion in granting it.

Reversed.

BAKER and BAILEY, JJ., concur.