**Cheryl TITUS, Appellant–Defendant,**

**v.**

**RHEITONE, INC., Appellee–Plaintiff.**

**No. 29A05–0105–CV–209.**

Court of Appeals of Indiana.

Nov. 15, 2001.

---

Jeffrey P. Hintermeister, Annette K. Fancher Bishop, O'Koon Hintermeister, PLLC, Indianapolis, IN, Attorneys for Appellant.

Scott S. Morrisson, Kerry L. Wagner, Henderson Daily Withrow & DeVoe, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Cheryl Titus' ("Titus") interlocutory appeal challenges the trial court's grant of a preliminary injunction in favor of Rheitone, Inc. ("Rheitone").

We affirm.

### ISSUES

1. Whether the trial court erroneously granted Rheitone's motion for preliminary injunction.
2. Whether the Indiana Trial Rule 65(C) security bond was sufficient.

### FACTS

Rheitone is an Indiana corporation engaged in the pre-press business.[1] From 1991 until 2000, Titus was employed by Rheitone and earned a salary ranging from $26,000 to $84,000. Titus' most recent position was Vice President of Operations. Prior to serving as vice president, Titus was given a memo clarifying certain sections of her employment agreement; it was dated February 3, 1995. On February 6, 1995, Titus signed an employment agreement containing the following relevant sections:

*Section V. Trade Secrets and Confidential Information:*

The parties agree that Employee's employment places Employee in a unique position of trust, which will allow [her] to acquire knowledge of confidential and proprietary information affecting or relating to the business of Employer, including by way of illustration only and not by way of limitation, names, addresses, or other key information relating to Employer's customers; information relating to prices or discounts at which Employer sells or has sold its products or services; the volume and price of products and services sold to particular customers; and the manner, means, or methods of Employer's business operations. The parties agree that all such information is strictly confidential and proprietary, and materially affects the successful operation of Employer's business. Therefore, with respect to all such information, Employee agrees that Employee will not, at any time, including after termination of this Agreement or termination of Employee's employment, for any reason, directly or indirectly, for Employee or for or through any person, proprietorship, partnership, corporation, or trust, or any other entity, as an owner, employee, agent, officer, director, trustee, or in any other capacity, divulge, disclose, or communicate such information, or use or apply such information where the information is to be used for the purpose of engaging in a business which competes with Employer.

*Section VI. Covenant Not To Compete:*

Employee agrees that, during the term of Employee's employment and for a period of three (3) years from the termination of Employee's employment, for any reason, Employee will not, directly or indirectly, for Employee or for another person, proprietorship, partnership, corporation, or trust, or any other entity, as an individual or as an owner,

---

1. Generally, pre-press workers prepare materials for printing presses by transforming text and pictures into finished pages and making printing plates of the pages from which copies can be made.

employee, agent, officer, director, trustee, or in any other capacity:

a. solicit or participate or aid in the solicitation of Employer's customers or [sic] employees;

b. contact or aid or participate in the contact, including allowing the use of Employee's name in connection with the contact of, Employer's customers for competitive purposes;

c. contact or aid or participate in the contact, including allowing the use of Employee's name in connection with the contact of, Employer's employees, for the purpose of inducing them to terminate their employment; and

d. engage in, conduct, promote, or participate in, either as an owner, investor, employee, officer, director, trustee, or agent, or in any other capacity whatsoever, the businesses of Employer.

The geographic region to which the prohibitions and covenants enumerated in this Section VI shall be all counties located in the State of Indiana.

The parties agree that in the event of a breach by Employee of any of the covenants and agreements contained in Sections V and VI hereof, the Employer shall suffer immediate, immeasurable, and irreparable harm and damage and, accordingly, the parties agree as follows:

a. These covenants shall be construed as agreements independent of any other provision of this Agreement, and the existence of any claim or cause of action by the Employee against the Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of these covenants by the Employer;

b. In the event of a violation of any of these covenants, the terms of all covenants shall be automatically extended for a period equal to the violation;

c. Employee expressly agrees that Employer shall be entitled to immediate injunctive and/or other equitable relief to prevent any anticipatory or continuing breach of this Agreement, or any part thereof, and to a decree of specific performance or similar equitable remedy, and to otherwise secure their enforcement, without the necessity of showing any irreparable injury or special damage, and that Employee shall be estopped from contesting such remedy; provided, that nothing herein shall be construed as a waiver by Employer of any right it may have or hereafter acquire to monetary damages by reason of any injury to its property, business or reputation or otherwise arising out of any wrongful act or omission of Employee hereunder, or as a waiver of any other remedy it may have by law. In addition, the Employer shall be entitled to recover reasonable attorney's fees incurred in the enforcement of these covenants; and,

d. Each covenant is separate and distinct from every other covenant, and in the event of the invalidity of any one covenant, the remaining obligations shall be deemed independent and enforceable. Further, although the parties agree that the restrictions herein are reasonable and necessary for the protection of Employer, the parties agree that if any claim is made by any party assert-

ing that this covenant is invalid or unenforceable, predicated upon the length of its term or its geographic area, the provision in question shall not thereby be rendered invalid or unenforceable but shall instead be so modified so as to be valid and fully enforceable for the maximum geographic area as any court of competent jurisdiction shall find to be reasonable, necessary, valid and legally enforceable.

*Section VII.*

The employee will be given at least 30 days written notice by the employer in event of termination for reasons other than "Just Cause" as defined by Indiana Code 22–4–15–1.

(App. 18–20, 22).

On September 18, 2000, David Pflug ("Pflug"), president of Rheitone, gave Titus a letter terminating her employment. The letter instructed Titus to immediately relinquish all keys, credit cards, and company possessions. The letter also stated that Titus' last day of employment would be October 18, 2000 and that she would be paid her salary until that date. She was also informed that she would be paid half of her vehicle expense and her incentive for August and half of September. Titus was reminded of the non-compete clause and asked not "to initiate or participate in any communicative process with any (current or past) Rheitone customers, vendors, or employees without authorization...." (Pl. Ex. B). She was then escorted from the premises.

Titus subsequently began searching for employment. She received, but declined, offers from Eli Lilly & Co. and Conseco. During October 2000, Titus began communicating with Mike LaLonde ("LaLonde"), a Midwest Graphics employee. Midwest Graphics was engaged in the business of working with corrugated boxes and pre-press printing. On October 10, 2000, Titus sent LaLonde a letter containing copies of her employment agreement, termination letter, and pay stubs. Titus informed LaLonde that she had discretely contacted Rheitone clients and asked for "an up-to-date figure from this year for monies paid Rheitone." (Pl. Ex. J). Titus also stated that she was interested in discussing ways to recover lost business for Midwest Graphics. She concluded by stating,

> Sometimes this is most effective by ensuring that you are directly overseeing the work and then gradually breaking away. This was my plan at Rheitone and that is why I have some clients now trying new ways with me.

(Pl. Ex. J).

On November 13, 2000, Titus was hired by Midwest Graphics to help increase the pre-press side of their business. Titus subsequently began contacting the following Rheitone customers by issuing quotes for proposed projects: RLR, Maro Art, Dynamark Graphics Group, Colorwheel Printing, George F. Cram Co., the Indianapolis Museum of Art, Opus Design, Doug David Fine Art, the Barn, and Carmel Pro.

On January 17, 2001, Rheitone filed its Complaint And Request For Preliminary And Permanent Injunction. Rheitone alleged that Titus divulged trade secrets and breached the covenant not to compete. On March 1, 2001, the trial court held a hearing on Rheitone's motion for preliminary injunction. On April 18, 2001, the trial court entered its Findings Of Fact, Conclusions Of Law And Judgment. The trial court found that Titus had breached the covenant not to compete, and that the geographic, temporal, and activity restrictions were reasonable and not overly broad. The trial court also found that Rheitone demonstrated that it had a legally protecti-

ble interest and that Titus had gained the ability to harm Rheitone's interest. Therefore, the trial court found that Titus was enjoined by the Indiana Uniform Trade Secrets Act and granted Rheitone's motion for preliminary injunction.

On April 23, 2001, Rheitone filed its Motion to Approve Bond. Rheitone argued that the trial court should set a bond of $5,000. Titus opposed Rheitone's motion arguing that $5,000 was insufficient to cover her salary. On June 19, 2001, the trial court set the security bond for Titus at $30,000. Titus appeals.

## DECISION

### 1. Covenant Not To Compete

The trial court found that the three-year time limitation, statewide coverage, and activities restricted were reasonable and not overly broad. The trial court also found that enforcement of the covenant would not be "adverse to the public interest." (App. 41). However, Titus argues that the trial court erroneously granted Rheitone's motion for preliminary injunction. Specifically, she argues the following: (1) that the temporal, geographic, and activity restrictions in the covenant not to compete are unreasonable as a matter of law; (2) that the covenant not to compete was void after Rheitone materially breached the employment agreement by terminating her employment without thirty-days notice and failing to pay her commission; and (3) that she did not misappropriate trade secrets.

 It is within a trial court's discretion to grant a preliminary injunction, and we review the trial court's decision for an abuse of that discretion. *Norlund v. Faust*, 675 N.E.2d 1142 (Ind.Ct.App.1997), *trans. denied.* Ind. Trial Rule 52(A) requires the trial court to make special findings of fact and state its conclusions when

determining whether or not to grant a preliminary injunction.

When findings and conclusions are made, the reviewing court must determine if the trial court's findings support the judgment. The judgment will be reversed only when clearly erroneous, i.e., when the judgment is unsupported by the findings and the conclusions entered on those findings. Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. To determine whether the findings or judgment are clearly erroneous, we consider the evidence only in the light most favorable to the judgment.

*Norlund*, 675 N.E.2d at 1149 (citations omitted).

 The trial court measures several factors when deciding to grant or deny a preliminary injunction:

(1) whether the movant's remedies at law are inadequate, causing irreparable harm pending resolution of the substantive action; (2) whether the movant has demonstrated at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) whether the threatened injury to the movant outweighs the potential harm the grant of the injunction would occasion upon the nonmovant; and (4) whether the public interest will be disserved.

*Port Commission v. Consolidated Grain and Barge*, 701 N.E.2d 882, 887 (Ind.Ct.App.1998), *trans. denied.* If the movant fails to prove even one of these requirements, the trial court's grant of an injunction is an abuse of discretion. *Id.* "We examine the trial court's findings and conclusions as they pertain to the pertinent factors." *Id.*

 Noncompetition agreements or covenants not to compete are in restraint of trade and are not favored by the law.

*Burk v. Heritage Food Service Equipment*, 737 N.E.2d 803 (Ind.Ct.App.2000). They are strictly construed against the employer and are enforced only if reasonable. *Id.* Covenants must be reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest. *Id.*

> In determining the reasonableness of the covenant, we examine at the outset whether the employer has asserted a legitimate interest that may be protected by a covenant. If the employer has asserted a legitimate, protectible interest, then we determine whether the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited. The employer bears the burden of showing that the covenant is reasonable and necessary in light of the circumstances. The employer must demonstrate, in other words, that "the former employee has gained a unique competitive advantage or ability to harm the employer before such employer is entitled to the protection of a noncompetition covenant."

*Burk,* 737 N.E.2d at 811 (quoting *Slisz v. Munzenreider,* 411 N.E.2d 700, 705 (Ind. Ct.App.1980) (citations omitted)).

We first consider whether Rheitone has shown that it has a legitimate protectible interest. We have held that an employer must show some reason why it would be unfair to allow the employee to compete with the former employer. *Duneland Emergency Physician's Medical Group v. Brunk,* 723 N.E.2d 963 (Ind.Ct.App.2000), *trans. denied.* Covenants have been upheld when they

> protect an employer's interest in trade secrets or other confidential information, and when they protect the good will generated between a customer and a business. "Elements of this good will include 'secret or confidential informa-

tion,' such as the names and addresses and requirements of customers and the advantage acquired through representative contact with the trade in the area of their application."

*Id.* at 966 (quoting *Donahue v. Permacel Tape Corp.,* 234 Ind. 398, 410–411, 127 N.E.2d 235, 240 (1955)).

In this case, the record reveals that Rheitone employed 26 people in the "extremely" competitive pre-press industry. (Tr. 23). Pflug testified that Rheitone had a market share of about "25 to 30 percent" of the Indianapolis area, served customers throughout the State of Indiana, and that Titus traveled to those locations. (Tr. 23). David Plummer ("Plummer"), a Rheitone employee, testified that Rheitone provides services to Indiana customers in Noblesville, Carmel, Westfield, Lebanon, Lafayette, South Bend, Ft. Wayne, Crawfordsville, West Lafayette, Bloomington, Franklin, Greenwood, Greencastle, Greenfield, New Albany, and St. Meinrad. In addition, Pflug also testified that Rheitone kept confidential information about customer purchases and preferences, discount levels, pricing, and volume on a limited access, password-protected computer that Titus had access to. In addition, Pflug stated Titus "controlled the sales function." (Tr. 27). Titus supervised the entire sales force and "had knowledge of all the customers of the sales reps, involvement with all the customers through her control and supervision of the production process, the production manager, and the production employees." (Tr. 24). Pflug further testified that Titus had more knowledge of customers and customer contacts than any other employee. In effect, Titus "ran the show." (Tr. 24).

In addition, Plummer testified that when Titus was hired, she had no experience in the pre-press industry and brought no customers to Rheitone. He corroborated

Pflugs' testimony concerning Titus' access to confidential customer information. Paul Bippus ("Bippus"), president of Colorwheel Printing Company, testified that his company has had a long business relationship with Rheitone. In fact, Colorwheel paid between $80,000 and $90,000 for services rendered by Rheitone in 2000. However, Bippus stated that Colorwheel stopped using Rheitone in November 2000. Notwithstanding a recent economic downturn, Bippus testified that during the past two to three months Colorwheel has sent approximately $15,000 worth of business to Midwest Graphics, and a significantly less amount of business has gone to Rheitone. Additionally, Bippus stated that Titus had contacted Colorwheel within those past few months.

The testimony in the record shows that Rheitone took steps to protect information about their customers. The information regarding customer preferences, discounts, and pricing gave Rheitone a competitive advantage. Therefore, we find that Rheitone has shown that it had a legitimate protectible interest in its confidential customer information.

We now consider whether the scope of the covenant was reasonable. "In determining the reasonableness of the restrictions set forth in a non-compete covenant, this court must look to: (a) whether the restrictions are wider than is necessary for the protection of the covenantee [Rheitone] in some legitimate interest; (b) the effect of the promise upon the covenantor [Titus]; and (c) the effect upon the public." *Duneland*, 723 N.E.2d at 966. Of particular importance is the time, geography, and activity restricted. *Id.*

In this case, the covenant contained a three (3) year time restriction that prohibited Titus from contacting or aiding in the contact of Rheitone's customers throughout the state of Indiana. We have held certain covenants containing lengthy time restriction to be reasonable. *See Fogle v. Shah*, 539 N.E.2d 500 (Ind.Ct.App. 1989) (three-year and indefinite time restrictions as part of a business purchase agreement was reasonable); *Pickett v. Pelican Service Associates*, 481 N.E.2d 1113 (Ind.Ct.App.1985) (five-year covenant reasonable); *Miller v. Frankfort Bottle Gas, Inc.*, 136 Ind.App. 456, 202 N.E.2d 395 (1964) (five-year covenant not to compete was reasonable); *Buanno v. Weinraub*, 226 Ind. 557, 81 N.E.2d 600 (1948) (three-year covenant reasonable). Concerning geographic restrictions, we have held that a covenant not to compete can extend "throughout the state of Indiana." *Smart Corp. v. Grider*, 650 N.E.2d 80, 85 (Ind.Ct. App.1995), *trans. denied.* However, we have limited the geographic scope of covenants to those areas in which the former employee actually worked. *Cap Gemini America, Inc. v. Judd*, 597 N.E.2d 1272 (Ind.Ct.App.1992). Further, "[a] covenant not to compete must be sufficiently specific in scope to coincide with only the legitimate interests of the employer and to allow the employee a clear understanding of what conduct is prohibited." *Smart*, 650 N.E.2d at 83.

Based on the evidence in the record, we find that the covenant is not wider than necessary to protect Rheitone's legitimate interest in its confidential customer information. It was undisputed that the pre-press industry has been changing at a very rapid pace. Because of the use of desktop computers, some companies have begun doing pre-press work in-house. Further, equipment is frequently replaced, and, in fact, Frederick Ropkey ("Ropkey"), owner of Ropkey Graphics and a competitor of Rheitone, testified that equipment and technology in the pre-press industry becomes obsolete every eighteen months. These facts additionally support the need

for a three-year restriction to protect Rheitone's competitive advantage in meeting the particular needs of its customers. Failure to do so would allow Titus to attract Rheitone's customers to Midwest Graphics by using Rheitone's confidential customer information to, among other things, offer lower prices. As Pflug testified, this highly competitive pace has caused some pre-press companies to cease business.

The statewide restriction is also reasonable and is not overly burdensome on Titus. Rheitone has shown it has customers throughout Indiana and with whom Titus has had previous contact with as an employee of Rheitone. Further, Rheitone has limited the covenant to this state. While we recognize that these restrictions make it difficult for Titus to remain in the pre-press field, the record shows that Titus knowingly executed the employment agreement; apparently, was handsomely compensated as an employee of Rheitone, and she has been able to secure employment with other employers in other fields. In addition, the covenant not to compete gave Titus a "clear understanding of what conduct was prohibited." *Smart*, 650 N.E.2d at 83. Titus demonstrated her knowledge of the non-competition agreement by testifying as an officer of Rheitone on at least two (2) occasions against former employees who attempted to violate their employment agreements. Titus further stated that she knew Rheitone's customer information was confidential and understood that she could not contact Rheitone's customers. In addition, her memo to LaLonde evidences an intention to woo Rheitone's customers despite the covenant. We also find that any disservice to the public by prohibiting Titus from contacting Rheitone's customers and competing against Rheitone is minimal.

Concerning Titus' argument that Rheitone cannot benefit from the covenant because it materially breached the employment agreement, the trial court found that she was fully compensated. The trial court also found that Titus failed to present any evidence regarding "the terms of any bonus plan if one exists." (App. 32–33). Therefore, the trial court concluded that Rheitone did not material breach the employment agreement.

We have held that "[a] party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract." *Licocci v. Cardinal Associates, Inc.*, 492 N.E.2d 48 (Ind.Ct.App.1986), *trans. denied*. This rule applies to covenants not to compete. *Id.* "Whether a party has committed a material breach is a question of fact, the resolution of which is dependent on several factors." *Anderson v. Horizon Homes, Inc.*, 644 N.E.2d 1281, 1290 (Ind.Ct.App. 1995), *trans. denied*.

Here, we find no evidence of a material breach of the employment agreement by Rheitone. At the hearing, Titus argued that she was not given thirty days notice because she was not allowed to work while she was being paid. Pflug testified that Titus' employment termination "was a business reorganization cost-driven decision." The record shows that Titus' employment at Rheitone was terminated immediately after receiving a letter from Pflug; however, Titus was then paid her salary for an additional thirty days. Titus does not dispute that she was paid for thirty (30) days after her termination pursuant to Section VII of her employment contract. Therefore, we find no material breach.

We now address Titus' assertion that she did not misappropriate any

trade secrets. Actual or threatened misappropriation of a trade secret can be enjoined. Ind.Code § 24–2–3–3. A trade secret has four characteristics: (1) information; (2) which derives independent economic value; (3) is not generally known, or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (4) the subject of efforts reasonable under the circumstances to maintain its secrecy. *Hydraulic Exchange and Repair, Inc. v. KM Specialty Pumps, Inc.*, 690 N.E.2d 782 (Ind.Ct.App.1998); *Standard Register Company v. Cleaver*, 30 F.Supp.2d 1084 (N.D.Ind.1998); Ind.Code § 24–2–3–2. A business's customer list can be a trade secret. *Kozuch v. CRA–MAR Video Center, Inc.*, 478 N.E.2d 110 (Ind.Ct.App. 1985), *trans. denied*. Further, misappropriation is defined as the disclosure of a trade secret to another without express or implied consent by a person who knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy. I.C. § 24–2–3–2(2)(B)(ii).

In this case, the record shows that Rheitone's confidential customer information was information that had economic value. Rheitone kept it in a password-protected computer and restricted access to the information. Further, only three employees, one of whom was Titus, knew the information contained in the computer. In addition, Titus admitted that she had acquired knowledge of Rheitone's confidential customer information, that she understood the employment agreement, and that she used her knowledge of the confidential information to contact Rheitone's former customers. As a result, we find that Rheitone's confidential customer information was a trade secret that Titus misappropriated.

The trial court found that Titus' use "of Rheitone's discount and confidential infor-

mation as a competitor would be very damaging to Rheitone because it would allow Titus to undercut Rheitone with every customer." (App. 31–32). The trial court also found that Rheitone had customers located throughout the state, and that Titus had visited those customers. Further, the trial court found that Rheitone had taken steps to protect its confidential customer information, that Titus had knowledge of Rheitone's confidential information, and that Titus used that information to contact Rheitone's customers. The trial court concluded that Rheitone's motion for preliminary injunction should be granted, and that Titus should be enjoined pursuant to Indiana's Uniform Trade Secrets Act. The evidence in the record strongly supports these findings, and the findings support the judgment. We find no abuse of discretion in the trial court's granting of Rheitone's motion for preliminary injunction.

### 2. *Security Bond*

Titus argues that the trial court erred in setting her security bond at $30,000. Specifically, she argues that the bond does not reflect her $84,000 salary earned in 1999 or her current state of unemployment.

Indiana Trial Rule 65(C) requires the applicant for a preliminary injunction to post a bond "in such sum as the court deems proper,...." We review a trial court's decision to fix a security bond for an abuse of discretion. *Howard D. Johnson Co. v. Parkside Development Corp.*, 169 Ind.App. 379, 348 N.E.2d 656 (1976). The size of the bond should approximate the damage the enjoined party will suffer if it is found that the injunction was wrongfully entered. *Laux v. Chopin Land Associates, Inc.*, 615 N.E.2d 902 (Ind.Ct.App.1993), *trans. denied*.

The record reveals that Rheitone offered to post a $5,000 bond. Titus ob-

jected and requested a much higher bond. The trial court then ordered Rheitone to post a $30,000 bond. As a result, we find that the trial court did consider Titus' economic position when it increased the bond to $30,000. A higher bond was likely not entered because there was evidence in the record showing that Titus was capable of securing employment in another field; a fact that would mitigate any damages that might be assessed against Rheitone. Therefore, we cannot say the trial court abused its discretion.

Affirmed.

MATHIAS, J., and VAIDIK, J., concur.