**Sherri GLEESON, Appellant–Defendant,**

v.

**PREFERRED SOURCING, LLC, Appellee–Plaintiff.**

No. 49A02–0608–CV–669.

Court of Appeals of Indiana.

March 25, 2008.

Joseph A. Christoff, Heidi K. Koeneman, Fort Wayne, IN, Attorneys for Appellant.

Thomas R. Devoe, John D. Papageorge, Sommer Barnard P.C., Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Sherri Gleeson appeals the trial court's grant of her former employer Preferred Sourcing, LLC's ("Preferred") motion for a preliminary injunction against her, which sought to enforce the terms of a non-compete agreement that she signed. Finding that Preferred has proven the requirements for a preliminary injunction and that several defenses do not apply, we conclude that the trial court did not abuse its discretion in granting the preliminary injunction. In addition, we conclude that the court abused its discretion in refusing to order security for the preliminary injunction. Accordingly, we affirm in part and reverse in part.

### Facts and Procedural History

Preferred[1] is an Indiana company with several locations throughout the State as

---

1. In late 2003, Preferred changed from a corporation to a limited liability company for tax purposes. Pursuant to the Bill of Sale and Assignment Agreement, substantially all of Preferred's assets and liabilities were assigned from the corporation to the limited liability company. Paragraph 13 of the Non–Competition and Confidentiality Agreement

well as in other states and countries. Among other things, Preferred provides inspection services and technical and engineering support services primarily for the automobile industry. Preferred, which first started in Indianapolis in January 1998, opened a location in Fort Wayne, Indiana, in mid–2000.

In September 2000, soon after moving from Michigan to Fort Wayne, Gleeson became the sales manager at Preferred's Fort Wayne location. She was the only sales representative at this location. On October 4, 2000, Jeff Weisenauer, president of Preferred and Gleeson's supervisor, presented Gleeson with a Non–Competition and Confidentiality Agreement ("Agreement"), which she signed that same day. The Agreement contains the following relevant provisions:

> 5. *Non–Competition.* Employee shall be subject to the following restrictions on competition:
>
> a. During Employee's employment with the Company and for a period of 18 months (which shall be extended by the length of any period during which Employee is in violation of this paragraph 5a) immediately following the Termination Date, Employee (on Employee's own behalf or that of any other person or entity) shall not within the Territory directly or indirectly own, manage, operate, control, invest in, lend to, acquire an interest in, or otherwise engage or participate in (whether as an employee, independent contractor, consultant, partner, shareholder, joint venturer, investor, or any other type of participant),

or use or permit Employee's name to be used in, any business (including the sale of any product or service) which directly or indirectly competes with any Business of the Company.

> b.[2] During Employee's employment with the Company and for a period of 18 months (which shall be extended by the length of any period during which Employee is in violation of this paragraph 5b) immediately following the Termination Date, Employee (on Employee's own behalf or that of any other person or entity) shall not directly or indirectly sell or otherwise provide or solicit the sale or provision of any product or service which competes directly or indirectly with any Business of the Company to any customer or prospective customer as to which, during the 12 months immediately preceding the Termination Date, Employee (i) engaged in any solicitation, sales activity, or other direct contact (in person, in writing, by telephone or electronically) on behalf of the Company; (ii) performed any duties or services on behalf of the Company; and/or (iii) received any Confidential Information.
>
> 6.[3] *Non–Solicitation.* For a period of 18 months (which period shall be extended to include any period of time during which the Employee is in violation of this paragraph 6) immediately following the Termination Date, Employee (on Employee's own behalf or that of any other person or entity) shall not directly or indirectly solicit, induce, or influence any Company customer, Company employee or any other person

---

signed by Gleeson provides, "This Agreement and the covenants herein shall extend to and inure to the benefit of the successors and assigns of the Company." Appellant's App. p. 174. Based on this provision of the Agreement, Gleeson consented to the assignment of the Agreement. Therefore, Gleeson's argument that the Agreement is unenforceable be-

cause she did not consent to its assignment is unavailing.

2. As discussed more below, Gleeson does not challenge paragraph 5(b) on appeal.

3. As discussed in footnote 7, *infra,* Preferred agrees to the excision of paragraph 6.

or entity who has an actual or prospective business or employment relationship with the Company to discontinue, reduce, reject or otherwise change in any manner adverse to the interests of the Company the nature or extent of such relationship with the Company.

Appellant's App. p. 172–73.

Gleeson was instrumental in growing Preferred's Fort Wayne location from a new, start-up facility in 2000 to one of its more profitable facilities by 2004, grossing almost two million dollars annually. Preferred has a niche market, which requires that its sales representatives make contacts and create customer relationships, and, as Preferred's Senior Vice President of Operations testified, customer relationships are "key" to Preferred's success. Tr. p. 107. Gleeson was one of Preferred's most successful sales representatives in creating and maintaining these customer relationships. While working for Preferred, Gleeson's primary sales territory included a radius of approximately 150 miles around Fort Wayne. However, Gleeson sometimes solicited business outside of this territory as well.

Gleeson resigned from Preferred in January 2005. At about the same time, Gleeson interviewed with a Detroit-based holding company that owns PTI Management Group, Inc. ("PTI") and Quality Containment Solutions, LLC ("QCS"). PTI is in the business of, among other things, placing engineers and managers. Some of its services, such as placement of engineers, compete with Preferred. QCS is in the business of providing inspection and containment services and related services. It is a direct competitor of Preferred. In February 2005, Gleeson began working for PTI in the Fort Wayne area to create the appearance that she would not be directly competing against Preferred for inspection and containment services.

Soon after joining PTI, Gleeson began soliciting sales on behalf of QCS, including contacting customers of Preferred. Upon learning of these activities, Preferred sent several cease and desist letters to Gleeson, the first one on April 14, 2005. Despite Gleeson's receipt of these letters and assurance to Preferred in a letter dated May 9, 2005, that she had discontinued working for QCS, Gleeson continued to engage in sales efforts on behalf of QCS. After discovering these continuing violations, on June 6, 2005, Preferred filed a Complaint for Damages and Permanent Injunction against Gleeson. Thereafter, on June 24, 2005, Gleeson formally transferred her employment over to QCS and became the Interim Operations Manager for the Fort Wayne office.

On October 11, 2005, Preferred filed a Verified Motion for Preliminary Injunction.[4] A hearing on this motion was held on December 7, 2005. On July 14, 2006, the trial court issued extensive findings of fact and conclusions of law granting the preliminary injunction. Specifically, the trial court concluded that "Preferred has a strong likelihood of success on the merits"; "Preferred has no adequate remedy at law for these breaches, and these continuing breaches will cause or threaten to cause irreparable harm to Preferred unless Gleeson is enjoined"; "[t]he harm Preferred would suffer if a preliminary injunction were denied exceeds the harm Gleeson would suffer if it were granted"; and "[t]he issuance of the requested injunction does not disserve the public interest." Ap-

---

4. The difference between a preliminary and a permanent injunction is procedural: a preliminary injunction is issued while an action is pending, while a permanent injunction is issued upon a final determination. *Ferrell v. Dunescape Beach Club Condominiums Phase I, Inc.*, 751 N.E.2d 702, 712–13 (Ind.Ct.App. 2001).

pellant's App. p. 13, 15, 16. Accordingly, the court ordered:

(a) Gleeson is enjoined for a period of 18 months from the date of this Order from (independently or as an employee, independent contractor, consultant, partner, shareholder, joint venturer, investor, or any other type of participant) directly or indirectly selling or otherwise providing or soliciting the sale or provision of any product or service which competes directly or indirectly with any business of Preferred to any customer or prospective customer as to which, during the 12 months preceding Gleeson's termination of employment with Preferred, Gleeson engaged in any solicitation, sales activity, or other direct contact on behalf of Preferred; performed any duties or services on behalf of Preferred; or received any confidential information.

(b) Gleeson is enjoined for a period of 18 months from the date of this Order from directly or indirectly owning, managing, operating, controlling, investing in, lending to, acquiring an interest in, or otherwise engaging or participating in (independently or as an employee, independent contractor, consultant, partner, shareholder, joint venturer, investor, or any other type of participant) or permitting Gleeson's name to be used in any business which directly or indirectly competes with any business of Preferred within a 150–mile radius of Preferred facility in Fort Wayne, Indiana.

(c) Gleeson is enjoined from directly or indirectly disclosing, using or exploiting any of Preferred's confidential informa-

tion for Gleeson's own benefit or for the benefit of any other person or entity. *Id.* at 17.[5] Gleeson now appeals.

## Discussion and Decision

█ We first observe that the issues in this case are now moot. The trial court enjoined Gleeson for a period of eighteen months beginning on July 14, 2006, the date it issued the preliminary injunction. Therefore, the preliminary injunction expired on January 14, 2008. Generally, we decline to address the merits of moot claims unless the matter is of public interest and capable of repetition. *Cent. Ind. Podiatry, P.C. v. Krueger,* 882 N.E.2d 723, 2008 WL 642529, *2 (Ind. Mar. 11, 2008). Injunctive actions based on noncompetition agreements for salespeople raise some fairly significant policy concerns and are likely to recur. Moreover, "full appellate review will often require more time than the term of the noncompetition agreement, so the need for guidance to trial courts in the future dictates that we address" Gleeson's arguments. *See id.*

Gleeson raises ten issues on appeal, which we consolidate and reorder as follows: (1) whether the trial court erred in granting Preferred's motion for a preliminary injunction; (2) whether the trial court erred in concluding that the defenses of waiver, laches, and breach did not apply; and (3) whether the trial court erred in not requiring Preferred to give security.

## I. Preliminary Injunction

█ The grant or denial of a request for a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was

---

5. We remind counsel for Gleeson that Indiana Appellate Rule 46(A)(10) provides that the Appellant's brief "shall include any written opinion, memorandum of decision or findings of fact and conclusions thereon relating to the issues raised on appeal." Counsel's attempt to incorporate the trial court's findings of fact and conclusions into her brief "by reference" is not sufficient.

a clear abuse of that discretion. *Id.; Ind. Family & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 161 (Ind.2002). When determining whether to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. *Barlow v. Sipes*, 744 N.E.2d 1, 5 (Ind.Ct.App.2001) (citing Ind. Trial Rule 52(A)), *trans. denied.* When findings and conclusions thereon are made, we must determine if the trial court's findings support the judgment. *Id.* We will reverse the trial court's judgment only when it is clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. *Id.* A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *CSX Transp., Inc. v. Rabold*, 691 N.E.2d 1275, 1277 (Ind.Ct.App.1998), *trans. denied.* We consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. *Barlow*, 744 N.E.2d at 5. Moreover, "[t]he power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor." *Id.*

To obtain a preliminary injunction, the moving party has the burden of showing by a preponderance of the evidence the following: (1) a reasonable likelihood of success at trial; (2) the remedies at law are inadequate; (3) the threatened injury to the movant outweighs the potential harm to the nonmoving party from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction. *Krueger*, 882 N.E.2d at 727, 2008 WL 642529 at *2; *Walgreen Co.*, 769 N.E.2d at 161. If the movant fails to prove any of these requirements, the trial court's grant of an injunction is an abuse of discretion. *Walgreen Co.*, 769 N.E.2d at 161.

On appeal, Gleeson challenges the following three requirements for a preliminary injunction.

## A. Likelihood of Success at Trial

The first issue is whether the trial court's conclusion that Preferred has proven a reasonable likelihood of success at trial is clearly erroneous. Noncompetition agreements or covenants not to compete are in restraint of trade and are not favored by the law. *Krueger*, 882 N.E.2d at 729, 2008 WL 642529 at *3; *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 91–92 (Ind. Ct.App.2001), *trans. denied.* They are strictly construed against the employer and are enforced only if reasonable. *Krueger*, 882 N.E.2d at 729, 2008 WL 642529 at *3; *Titus*, 758 N.E.2d at 91–92. Covenants must be reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest. *Titus*, 758 N.E.2d at 91–92. In determining the reasonableness of the covenant, we first examine whether the employer has asserted a legitimate interest that may be protected by a covenant. *Krueger*, 882 N.E.2d at 728, 2008 WL 642529 at *4; *Titus*, 758 N.E.2d at 92. If the employer has asserted a legitimate, protectible interest, we then determine whether the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited. *Krueger*, 882 N.E.2d at 729, 2008 WL 642529 at *4; *Titus*, 758 N.E.2d at 92. The employer bears the burden of showing that the covenant is reasonable and necessary in light of the circumstances. *Titus*, 758 N.E.2d at 92. In other words, the employer must demonstrate that the employee has gained a unique competitive advantage or ability to harm the employer

before such employer is entitled to the protection of a noncompetition agreement. *Id.*

Here, the court concluded that Preferred has two interests that are legally protectible by non-compete covenants: (1) the business advantage of personal contact with its actual and prospective customers and the prospect of repeat business for those customers and (2) maintaining the secrecy of its confidential information and ensuring that the information is not used by a former employee to compete. Appellant's App. p. 13 (Conclusions No. 3 & 4). On appeal, Gleeson argues that Preferred did not have a protectible interest in its confidential information, specifically its customer lists and pricing information. We need not determine whether the confidential information was a protectible interest because Preferred established a protectible interest in its customer relationships.

"In Indiana, the law recognizes a protectable interest in the good will generated between a customer and a business." *Norlund v. Faust,* 675 N.E.2d 1142, 1154 (Ind.Ct.App.1997) (citations omitted), *clarified on denial of reh'g,* 678 N.E.2d 421 (Ind.Ct.App.1997), *trans. denied; see also Krueger,* 882 N.E.2d at 729, 2008 WL 642529 at *4 ("Indiana courts have held that the advantageous familiarity and personal contact which employees derive from dealing with an employer's customers are elements of an employer's 'good will' and are a protectible interest which may justify a restraint ....") (quotation omitted). Good will includes secret or confidential information such as the names and addresses of customers and the advantage acquired through representative contact. *Cohoon v. Fin. Plans & Strategies, Inc.,* 760 N.E.2d 190, 195 (Ind.Ct. App.2001). That good will may be protected by a covenant not to compete. *Nor-*

*lund,* 675 N.E.2d at 1154. In industries where personal contact between the employee and the customer is especially important due to the similarity in the product offered by the competitors, the advantage acquired through the employee's representative contact with the customer is part of the employer's good will, regardless of whether the employee had access to confidential information. *MacGill v. Reid,* 850 N.E.2d 926, 930 (Ind.Ct.App.2006). If an employee is hired in order to generate such good will, she may be enjoined from subsequently contacting those customers or using that good will to her advantage. *Norlund,* 675 N.E.2d at 1154. Indeed, Indiana courts have held that a salesperson may be restrained from contacting former customers within her previous sales area. *Id.* There is a personal nature to the relationship between a salesperson and customer, and many times the customer's only contact with the company is through the salesperson. *Id.* at 1154–55.

Here, Preferred's Vice President of Operations testified about Gleeson's role in Preferred's success at its Fort Wayne facility:

> [Gleeson's] role was a pioneering role. It involves a target market that you're going for, which is automotive. It's making contacts, it's creating relationships, and it is not easy. It's tough. It's hitting the pavement, it's making those calls and creating sales. And it took her a little while to do it, but eventually she was successful.

Tr. p. 106. Specifically, Gleeson brought Preferred from zero to two million dollars in sales in just a few years. The Vice President also testified that customer relationships are important in this business, which is a "people business," and that Gleeson "was one of our most successful sales associates in creating those relation-

ships with our customers." *Id.* at 108. Preferred's customer relationships and good will can be protected by a covenant not to compete. Accordingly, we find that the evidence clearly establishes that Preferred has at least one legitimate, protectible interest.

We next consider whether the scope of the terms protecting this legitimate interest is reasonable in terms of time, geography, and types of activity prohibited. *See Krueger,* 882 N.E.2d at 729, 2008 WL 642529 at *4; *MacGill,* 850 N.E.2d at 930. As for time, paragraph 5 of the Agreement restricts Gleeson from competing for a period of eighteen months. The trial court, citing several Indiana cases, concluded, "The restrictive covenants in the Agreement are reasonably limited in their duration." Appellant's App. p. 15 (Conclusion No. 9). Indeed, Indiana courts have upheld non-competition agreements that restrict competitive activity for two-year periods. *See, e.g., Raymundo v. Hammond Clinic Ass'n,* 449 N.E.2d 276, 278 (Ind.1983); *Washel v. Bryant,* 770 N.E.2d 902, 904 (Ind.Ct.App. 2002); *Norlund,* 675 N.E.2d at 1155. Accordingly, the eighteen-month restriction here is reasonable. The fact that the Agreement contains a provision tolling this period during any violation by Gleeson does not change this result, especially in light of the trial court's conclusion that Gleeson was in violation of the Agreement from the time she left Preferred until the time the trial court issued the preliminary injunction. *See Century Pers., Inc. v. Brummett,* 499 N.E.2d 1160, 1162 (Ind.Ct. App.1986) (addressing agreement where six-month period did not expire during any violation of the restrictive covenant).

As for geography, paragraph 1(D) of the Agreement restricts Gleeson from competing within a 150–mile radius of Preferred's facilities in Indianapolis, Fort Wayne, Bellefontaine, Ohio, as well as within a 150–mile radius of any other Preferred facility existing at the time of termination. Appellant's App. p. 171. However, in its order granting Preferred's preliminary injunction, the trial court only enjoined Gleeson from competing "within a 150–mile radius of Preferred facility in Fort Wayne, Indiana." [6] *Id.* at 17. The trial court concluded that such a geographic restriction was reasonable because it covered the territories where Gleeson focused her efforts. *Id.* at 13–14 (Conclusion No. 5). Despite the trial court's reduction in the geographical restriction contained in the Agreement, Gleeson says that there is simply no "evidence that [her] territory extended that far." Appellant's Br. p. 32.

"Whether a geographic scope is reasonable depends on the interest of the employer that the restriction serves." *Krueger,* 882 N.E.2d at 730, 2008 WL 642529 at *5. As the trial court found, Gleeson's primary sales territory included a 150–mile radius around Fort Wayne. This represented an area encompassing a roughly two-hour drive from Fort Wayne. In addition, Gleeson sometimes solicited business outside this territory as well, including Illinois and Michigan. Despite Gleeson's argument that depending on the direction of travel, she could sometimes travel just eighty miles from Fort Wayne in a two-hour period, the evidence supports a broader geographical region. *See Raymundo,* 449 N.E.2d at 282 ("[W]e are aware of no authority indicating that in order for a covenant to be reasonable, the covenantee must show that it had rendered its service or sold its product in every nook and cranny of the protected area. Were it

**6.** By limiting the geographical restriction to Fort Wayne, the trial court was, in effect, blue-penciling the unreasonable portions from the Agreement.

otherwise, no such covenant could ever stand."). Because the 150–mile restriction in the trial court's order was limited to the area in which Gleeson solicited business for Preferred, the geographic restriction is reasonable. *See Krueger,* 882 N.E.2d at 730, 2008 WL 642529 at *5 ("We agree with the courts that have held that non-competition agreements justified by the employer's development of patient relationships must be limited to the area in which the physician has had patient contact.").

As for types of activity prohibited, we first note that Gleeson does not challenge paragraph 5(b) on appeal. Paragraph 5(b) provides that Gleeson shall not directly or indirectly sell or otherwise provide or solicit the sale or provision of any product or service that competes directly or indirectly with any business of Preferred to any customer as to which Gleeson (during the twelve months before she resigned) engaged in any solicitation, sales activity, or other direct contact, performed any duties or services, or received any confidential information. Gleeson does, however, challenge paragraph 5(a), which is much broader in its restrictions. As set forth above, paragraph 5(a) of the Agreement provides that Gleeson shall not:

> directly or indirectly own, manage, operate, control, invest in, lend to, acquire an interest in, or otherwise engage or participate in (whether as an employee, independent contractor, consultant, partner, shareholder, joint venturer, investor, or any other type of participant), or use or permit Employee's name to be used in, any business (including the sale of any product or service) which directly or indirectly competes with any Business of the Company[.]

Appellant's App. p. 172. In essence, the Agreement prevents Gleeson from working in any capacity for a business that directly

or indirectly competes with Preferred. Gleeson argues that this restriction is unreasonably broad because it extends beyond the scope of Preferred's legitimate interests. We agree.

This Court has previously held that non-competition agreements and covenants not to compete prohibiting an employee from working in any capacity for a competitor or from working within portions of the business with which the employee was never associated are unreasonable because they extend beyond the scope of the employer's legitimate interests. *MacGill,* 850 N.E.2d at 932 (citations omitted). For example, in *Burk v. Heritage Food Service Equipment, Inc.,* 737 N.E.2d 803 (Ind.Ct. App.2000), the noncompetition agreement provided:

> (a) Employee will not ... do any of the following:

> (i) Own, manage, control or participate in the ownership, management or control of, or be employed or engaged by or otherwise affiliated or associated as consultant, independent contractor or otherwise with any corporation, partnership, proprietorship, firm, association or other business entity which competes with, or otherwise engages in any business of the Corporation, as presently conducted in the States [sic] of Indiana (Territory" [sic] ).

*Id.* at 812 (record citation omitted). On appeal, the employee argued that the covenant was overbroad because it effectively prohibited that employee from working for a competitor in any capacity. We agreed and held that the restriction was unenforceable. *Id.*

In support of its argument that the types of activities prohibited by paragraph 5(a) are reasonable, Preferred relies on *Unger v. FFW Corp.,* 771 N.E.2d 1240 (Ind.Ct.App.2002). There, a bank presi-

dent signed a covenant not to compete, which provided:

> Competitive Activity. During the term hereof and for a period of one (1) year after termination of the employment, Employee shall not, in Wabash County, Indiana, or any county adjacent thereto, either on his own behalf or as an employee, agent or representative of another party, person or corporation, be engaged or actively interested directly or indirectly in any business competitive with the business of Employer (as defined below) and he will not directly own, manage, operate, gain control of, finance or otherwise participate in the ownership, management, operation or control of or be employed by or connected in any manner with any business which is competitive with the business of Employer, nor will he directly or indirectly tamper with or induce any employees, agents, or customers of Employer to leave Employer or to stop buying from Employer, or to otherwise abandon Employer; and for a breach of the foregoing covenants, Employer, its successors and assigns, in addition to all other rights and remedies, shall be entitled to injunctive relief. The term "business of Employer" as used herein means and includes business in which Employer or any successor thereto (by merger or otherwise), or any present or future subsidiary or division of Employer is now engaged, and other or additional business in which Employer, and successor thereof, or subsidiaries, may be engaged hereafter as determined by the Board of Directors of Employer.

*Id.* at 1242. On appeal, the bank president, relying upon *Burk*, argued that the broad restriction was unenforceable. Another panel of this Court distinguished *Burk* by noting that "[u]nlike in *Burk*, however, Unger was only prevented from participating in any 'business competitive with the business of Employer' in Wabash County and the six adjacent counties for one year after the termination of employment." *Id.* at 1245 (footnote omitted). The panel concluded that the scope of activities prohibited were reasonable and that the agreement was enforceable. *Id.*

Although it is difficult to reconcile *Burk* and *Unger*, it seems as though recent cases have followed *Burk*. *See, e.g., MacGill*, 850 N.E.2d at 932–33 (holding that a covenant not to compete was unreasonable because the covenant which restricted the employee from owning, managing, or materially participating in any business substantially similar to the employer's business would prevent her from being employed in any capacity by any other cleaning business and was unreasonable because it extended beyond the scope of the employer's good will interest of protecting its current customers and housekeepers); *Sharvelle v. Magnante*, 836 N.E.2d 432, 438 (Ind.Ct.App.2005) (holding that a covenant's prohibition on a physician from practicing "health care of every nature and kind" was unreasonable where the physician ·had been employed to practice in the specialty of ophthalmology); *Pathfinder Commc'ns Corp. v. Macy*, 795 N.E.2d 1103, 1114 (Ind.Ct.App. 2003) (holding that a covenant's provision that a radio disc jockey would "not engage in activities" at certain radio stations was overbroad because it would have prevented the employee from being employed in any capacity by any radio station listed in the covenant and "extend[ed] far beyond" the employer's legitimate interest in the employee).

Following *Burk*'s lead, we conclude that paragraph 5(a) of the Agreement extends far beyond Preferred's legitimate interests in Gleeson. The covenant not to compete prevents Gleeson from being an employee in any capacity of any business in competi-

tion with Preferred, even though Gleeson's job at Preferred was limited to soliciting sales. The provision does not take into account the services specifically provided by Gleeson to Preferred. Thus, the provision is unreasonable and unenforceable.

 Nevertheless, Preferred asserts that even if this portion of paragraph 5(a) is unreasonable, we should apply the blue pencil doctrine, which both parties authorized under paragraph 12 of the Agreement. If a court finds that portions of a noncompetition agreement or covenant not to compete are unreasonable, it may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they have not made. *Burk*, 737 N.E.2d at 811. However, if such a covenant is clearly divisible into parts, and some parts are reasonable while others are unreasonable, a court may enforce the reasonable portions only. *Id.; see also Krueger*, 882 N.E.2d at 730, 2008 WL 642529 at *5. This process of striking unreasonable provisions from a covenant is known as "blue-penciling." *Burk*, 737 N.E.2d at 811; *see also Krueger*, 882 N.E.2d at 730, 2008 WL 642529 at *5. "When applying the blue pencil, a court must not add terms that were not originally part of the agreement." *Burk*, 737 N.E.2d at 811. Rather, "unreasonable restraints are rendered reasonable by scratching out any offensive clauses to give effect to the parties intentions." *Id.* (quotation omitted).

 Our review of paragraph 5(a) reveals that we cannot make the provision reasonable without adding terms to limit its application to solicitation of sales. However, we note that paragraph 5(b), which is not contested on appeal, does just that. In addition, the trial court made the following finding:

> As QCS's Fort Wayne operations manager, Gleeson holds the highest management position at QCS's Fort Wayne facility. She is responsible for all aspects of the facility's operations, including customer service. In this capacity she has had contact with, and will likely continue to have contact with, Restricted Customers. In this capacity, she is an integral part of providing QCS services that compete with Preferred throughout the Fort Wayne area.

Appellant's App. p. 12. Because of the applicability of paragraph 5(b) and the trial court's finding that Gleeson's job as Operations Manager at QCS involved solicitation of customers, the trial court's conclusion that Preferred has proven a reasonable likelihood of success at trial is not clearly erroneous.[7]

## B. Adequacy of Remedies at Law

 The next issue is whether the trial court's conclusion that "Preferred has no adequate remedy at law for these breaches, and these continuing breaches will cause or threaten to cause irreparable harm to Preferred unless Gleeson is enjoined" is clearly erroneous. Appellant's App. p. 15 (Conclusion No. 13). If an adequate remedy at law exists, injunctive relief should not be granted. *Robert's*

7. Gleeson also mounts a challenge to paragraph 6 of the Agreement. In its brief, Preferred does not completely or adequately address Gleeson's arguments concerning paragraph 6 on grounds that Preferred did not obtain a preliminary injunction as to that section of the Agreement. Rather, Preferred suggests that this paragraph be severed from the Agreement. *See* Appellee's Br. p. 29 ("Regardless, the enforceability of section 6 is not an issue germane to this appeal. Moreover, section 6 is clearly severable from the other sections of the Agreement and therefore does not effect [sic] the enforceability of the remainder of the Agreement."). We therefore excise paragraph 6 from the Agreement as well.

*Hair Designers, Inc. v. Pearson,* 780 N.E.2d 858, 864 (Ind.Ct.App.2002) (citing *Walgreen Co.,* 769 N.E.2d at 162). "The trial court 'has a duty to determine whether the legal remedy is as full and adequate as the equitable remedy.'" *Id.* (quoting *Washel,* 770 N.E.2d at 906–907). "'A legal remedy is adequate only where it is as plain and complete and adequate-or, in other words, as practical and efficient to the ends of justice and its prompt administration-as the remedy in equity.'" *Id.* (quoting *Washel,* 770 N.E.2d at 907); *see also Krueger,* 882 N.E.2d at 732, 2008 WL 642529 at *7. "A party suffering 'mere economic injury is not entitled to injunctive relief because damages are sufficient to make the party whole.'" *Pearson,* 780 N.E.2d at 864 (quoting *Walgreen Co.,* 769 N.E.2d at 162).

■ Here, the trial court found that "Preferred's damages resulting from Gleeson's breaches of the Agreement will be difficult to ascertain and cannot adequately be compensated in monetary damages." Appellant's App. p. 15 (Conclusion No. 13). Preferred presented evidence that Gleeson continued to engage in sales on behalf of QCS even after receiving cease and desist letters from Preferred. Preferred's representative testified that although Preferred lost business to QCS (specifically AutoLiv, McCoy Belt, and VCT/VNA), it would be difficult to say exactly what business would have gone to Preferred had Gleeson not been working for QCS. *See* Tr. p. 137. As such, monetary damages are difficult to ascertain. *See Krueger,* 882 N.E.2d at 733, 2008 WL 642529 at *8 (noting that it would be "virtually impossible to quantify the profits diverted by Krueger's move" to a different podiatry practice). Even if a specific dollar amount for lost business could be calculated, thereby making a remedy at law sufficient, losses to Preferred's good will as a result of Gleeson's current

and future violations of the Agreement warrant a finding of irreparable harm. *See Pearson,* 780 N.E.2d at 865–66. Accordingly, the trial court's conclusion that Preferred will suffer irreparable harm is not clearly erroneous.

### C. Threatened Injury and Potential Harm

■ The next issue is whether the trial court's conclusion that "[t]he harm Preferred would suffer if a preliminary injunction were denied exceeds the harm Gleeson would suffer if it were granted" is clearly erroneous. Appellant's App. p. 16 (Conclusion No. 14). On appeal, Gleeson complains that the injunction against her is inequitable because "[a]s a mother of three children, [she] relies upon the stability and reliability of her paycheck with QCS to feed and support herself, as well as her three children.... Without her job, it would be impossible for [her] to handle her mortgage and other financial obligations." Appellant's Br. p. 33. Gleeson's situation, however, is self imposed. That is, Gleeson freely entered into the Agreement and promised not to compete with Preferred, voluntarily terminated her employment with Preferred, sought a new job, and then tried to hide her competitive activities from Preferred. Under the preliminary injunction, Gleeson is free to accept employment, in any capacity, with a competitor of Preferred outside the 150–mile radius of Fort Wayne, to use her sales experience in another industry in Fort Wayne, or to work for a competitor of Preferred in the Fort Wayne area as long as she does not directly or indirectly sell or otherwise provide or solicit the sale or provision of any product or service which competes directly or indirectly with any business of Preferred. Balanced against that is that Preferred is losing the benefit of the covenant not to compete as well as customer good will. The trial

court's conclusion that the harm Preferred would suffer if a preliminary injunction were denied exceeds the harm Gleeson would suffer if it were granted is not clearly erroneous. Because Preferred has proven the requirements for a preliminary injunction, the trial court did not abuse its discretion in granting Preferred's motion for a preliminary injunction against Gleeson.

## II. Defenses

Next, Gleeson contends that the trial court erred in concluding that the defenses of waiver, laches, and breach did not apply. We address each defense in turn.

### A. Waiver and Acquiescence

 First, Gleeson argues that the trial court's conclusion that "Preferred did not waive any provisions of the Agreement by failing to enforce similar agreements against other employees" is clearly erroneous.[8] Appellant's App. p. 16 (Conclusion No. 18). Specifically, Gleeson asserts that because she is the only employee that Preferred has sought injunctive relief against despite numerous violations by other former employees, Preferred has acquiesced in her conduct and therefore cannot enjoin her. In support of her argument, Gleeson relies on *Stewart v. Jackson*, 635 N.E.2d 186 (Ind.Ct.App. 1994), *trans. denied*, which held, "A party defending against an equitable enforcement of a restrictive covenant may plead the defense of acquiescence where the party seeking the injunction acquiesced in *similar* violations." *Id.* at 194 (emphasis added). Despite the obvious difference between this case and *Stewart*, in that *Stewart* involves a covenant against commercial activity within a home, we find that Preferred has established that Gleeson's conduct was more damaging than the other former employees' conduct. Because Gleeson's violations are dissimilar, there can be no acquiescence on the part of Preferred. Specifically, Preferred's Vice President of Operations testified that Gleeson's threat to Preferred in terms of being able to take business away was

> the only reason we're pursuing this. Obviously the relationships that she created had a potential to be damaging, were starting to be damaging, and now they truly are being damaging. We have to make a business decision if these relationships are going to be damaging to the business because this is not inexpensive for us to pursue these situations, as far as legal proceedings go. We have to be certain that there's going to be damage to our business and that's when we make that business decision to pursue them.

Tr. p. 114. In addition, the Vice President testified that as far as the other former employees were concerned, Preferred sent cease and desist letters to them as well and received favorable responses from some and worked out resolutions with the others. In contrast, Gleeson continued secretly competing with Preferred after receiving such letters. The trial court's conclusion that Preferred did not acquiesce is not clearly erroneous.

### B. Laches

 Next, Gleeson argues that the trial court erred by failing to address her defense of laches in any of its findings of fact or conclusions. Specifically, Gleeson asserts that any recovery in this case is precluded because "Preferred delayed pursuing its rights for such a length of time." Appellant's Br. p. 39. The equitable doctrine of laches contains three elements: (1)

---

8. We note that paragraph 13 of the Agreement provides that no waiver of the Agreement is effective unless it is in writing. Appellant's App. p. 174.

inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances causing prejudice to the adverse party. *SMDfund, Inc. v. Fort Wayne–Allen County Airport Auth.,* 831 N.E.2d 725, 729 (Ind.2005). Laches does not turn on time alone. *Id.* at 731. Unreasonable delay causing prejudice or injury is necessary. *Id.* Prejudice may be created if a party, with knowledge of the relevant facts, permits the passing of time to work a change of circumstances by the other party. *Id.*

Here, Gleeson points out that Preferred began suspecting that she was competing in March or April 2005, yet did not file its complaint until June 6, 2005, and its motion for preliminary injunction until October 11, 2005, approximately six months after it first suspected she was competing. In essence, Gleeson believes that six months is an inexcusable delay.[9] Gleeson is wrong in her belief.

As for the delay between the time Preferred first discovered that Gleeson was competing until the time it filed its complaint, which is approximately two to three months, Preferred sent several cease and desist letters to Gleeson in an attempt to amicably resolve the situation. In fact, Preferred sent its first letter on April 14, 2005. Gleeson responded with her own letter assuring Preferred that she would cease competing. When Preferred learned that Gleeson was still competing, it filed suit. There is nothing unreasonable about this passage of time.

As for the delay between Preferred's filing of its complaint and filing of its motion for a preliminary injunction, which is approximately four months, Preferred responds that after filing its complaint, it engaged in limited discovery in order to ascertain the extent to which Gleeson had been violating the Agreement. Upon collecting significant evidence of Gleeson's extensive and highly damaging competitive activities, it filed its motion for a preliminary injunction. There is nothing unreasonable about this passage of time either. Simply put, this is not a case where Gleeson worked for a competitor for six months without any indication from Preferred that she might be violating the Agreement. Rather, Gleeson left Preferred in late January 2005, began working for PTI in February 2005, and received a cease and desist letter from Preferred in mid-April 2005. Because Gleeson has failed to prove an inexcusable delay in Preferred's assertion of its rights, we do not address the remaining elements of laches.

### C. Breach

Next, Gleeson argues that the trial court's conclusion that "Preferred did not breach any term of the Agreement or any other term or condition of employment that would relieve Gleeson of her obligations under the Agreement" is clearly erroneous. Appellant's App. p. 16 (Conclusion No. 17). Specifically, Gleeson asserts that Preferred materially breached the Agreement by failing to give her a performance review and a $30 Sam's Club gift card in 2004, thereby relieving her of her obligations under the Agreement.

■■■ Gleeson is correct "that a breach by the employer may prevent en-

---

**9.** In support, Gleeson relies on *Bonded Fibers Midwest, Inc. v. Bounds,* 2005 WL 1243392 (N.D.Ind. May 3, 2005) (order denying temporary restraining order), which is "not reported." Although we find this case to be distinguishable, we note that the precedential value of it is questionable. Specifically, Federal Rule of Appellate Procedure 32.1 provides that a court may not prohibit or restrict the citation of federal judicial opinions, orders, judgments, and other written dispositions that have been designated as "unpublished," "not for publication," "non-precedential," "not precedent," and the like *"issued on or after January 1, 2007."* (Emphasis added). *Bounds* was issued in 2005.

forcement of a noncompetition agreement." *Krueger,* 882 N.E.2d at 733, 2008 WL 642529 at \*7 (citing *Licocci v. Cardinal Assocs., Inc.,* 492 N.E.2d 48 (Ind.Ct.App. 1986), *reh'g denied, trans. denied* ). Here, however, the Agreement has no provision calling for an annual review or a gift card. Gleeson points to her offer letter from Preferred in 2000 as the basis for the annual review requirement and the employee handbook as the basis for the gift card. Even assuming the offer letter and employee handbook constitute contracts, which we doubt, the Agreement is entirely separate from those documents, with its own consideration, rights, and obligations. As such, Preferred's alleged breaches of the offer letter and the employee handbook do not operate as a defense against the Agreement. Because the Agreement is a stand-alone document, the cases upon which Gleeson relies on appeal, *Licocci* and *Sallee v. Mason,* 714 N.E.2d 757, 763 (Ind.Ct.App.1999), *reh'g denied, trans. denied,* are readily distinguishable. In those cases, the obligations at issue were contained or expressly incorporated by reference into the same contract. In any event, Gleeson has failed to prove that these alleged breaches are *material,* which is a required element.

In addition, we note that paragraph 8 of the Agreement provides, "Employee further acknowledges and agrees that the existence of any claim or cause of action by Employee against Employer, whether or not predicated upon Employee's employment relationship with Employer, shall not relieve Employee of Employee's obligations under this Agreement." Appel-

lant's App. p. 173. The Indiana Supreme Court recently held in *Krueger* that such provisions [10] are enforceable, even in the face of apparently major breaches by the employer. 882 N.E.2d at 732, 2008 WL 642529 at \*7. The trial court's conclusion that Preferred did not breach the Agreement, thus relieving Gleeson of her obligations under the Agreement, is not clearly erroneous.

## III. Security

As her final issue, Gleeson contends that the trial court's "failure to issue a security or bond in this case, in the event its injunction was wrongfully entered is contrary to Indiana law, is clearly erroneous, and should be reversed on this basis alone." Appellant's Br. p. 47. Indiana Trial Rule 65(C) provides, "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The reason for requiring security relates to the expeditious manner in which preliminary injunctions are issued and to the lack of a full hearing upon the facts. *Barlow,* 744 N.E.2d at 11. "The fixing of the amount of the security bond is a discretionary function of the trial court and is reversible only for an abuse of that discretion." *Kennedy v. Kennedy,* 616 N.E.2d 39, 43 (Ind. Ct.App.1993) (quotation omitted), *trans. denied.* "When assessing the amount of security, the trial court should consider not only the estimated damages offered by the parties but its own experience and knowledge." *Id.* (quotation omitted). "If secu-

---

10. The provision in *Krueger* provides that the noncompetition agreement

> shall be construed as independent of any other provision of this Contract and shall survive the termination of this Contract. The existence of any claim or cause of ac-

tion of Employee against Corporation, whether predicated on this Contract or otherwise, shall not constitute a defense to the enforcement by Corporation of this Restrictive Covenant.
*Krueger,* 882 N.E.2d at 732, 2008 WL 642529 at \*7.

rity is warranted, the failure to require it does not render the injunction void; instead, the normal course is to remand for determination of sufficient bond." *Id.* at 43–44 (citation omitted).

This Court has affirmed a trial court's failure to order security in at least two cases involving a preliminary injunction. In *Crossmann Communities, Inc. v. Dean,* 767 N.E.2d 1035 (Ind.Ct.App.2002), the trial court refused to require security because Crossmann's claim of damages was insignificant based upon the magnitude of its construction business. We found that this was not an abuse of discretion. *Id.* at 1043. In *Kennedy,* the trial court enjoined the husband from dissipating his pension pending resolution of a fraud claim. However, the trial court declined to require security because the husband did not contend he had suffered or would suffer harm on account of the preliminary injunction. We agreed. *Kennedy,* 616 N.E.2d at 44.

 Here, however, although Gleeson does not argue on appeal what her damages would be, those damages are readily apparent. The injunction, in essence, prohibited Gleeson from working at QCS, meaning a loss in salary to Gleeson, which is not insignificant. As such, the trial court should have required Preferred to post security.

Based on the foregoing, we hold that the trial court properly granted the preliminary injunction in favor of Preferred regarding paragraph 5(b) of the Agreement. In addition, we hold that the trial court abused its discretion in failing to require Preferred to post security pursuant to Trial Rule 65(C).

Affirmed in part and reversed in part.

BAKER, C.J., and BAILEY, J., concur.