**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 10 2014, 9:05 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**WILLIAM M. KROWL**
Krowl Law, LLC
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**MARVIN MITCHELL**
**RICHARD J. DICK**
Mitchell Hurst Dick & McNelis, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

DONALD MOSS,                                )
                                            )
    Appellant/Defendant,            )
                                            )
        vs.                  )    No. 49A05-1401-PL-3
                                            )
PROGRESSIVE DESIGN APPAREL, INC.            )
                                            )
    Appellee/Plaintiff.             )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable John F. Hanley, Judge
Cause No. 49D11-1310-PL-038122

**September 10, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Chief Judge**

## Case Summary

Donald Moss appeals the trial court's grant of a preliminary injunction in favor of Progressive Design Apparel, Inc. (PDA). Moss contends that the trial court erred in granting the preliminary injunction and ordering PDA to pay a bond of $100, which he argues is insufficient. We hold that the trial court did not err in granting the preliminary injunction; however, we agree that the bond is insufficient based on the damages estimated in this case. We affirm in part and remand in part.

## Facts and Procedural History

Moss, a salesman, began working for PDA as an independent sales agent in 2010. PDA sells logoed products, promotional items, and apparel.[1] In April 2013 Moss became a salaried PDA employee and was given the title of Vice President. At this time, Moss signed non-disclosure and non-compete agreements. In relevant part, the non-compete agreement provided:

> [Moss] expressly agrees that at no time during [Moss's] employment, and for a period of two (2) years immediately following termination of said employment (such period called "The Applicable Period"), regardless of whether such termination is voluntary or involuntary, will he, for himself, or on behalf of any other person, persons, partnership, association, or corporation, call upon any customer of [PDA] for the purpose of soliciting or selling to such customer any services offered by [PDA]; nor will he in any way, directly or indirectly, for himself, or on behalf of any other person, persons, partnership, association, or corporation, solicit, divert, or take away any customer of [PDA] during the term of his employment or for two (2) years following termination of his employment. For purposes of this restriction on solicitation of customers of [PDA], the term "customer" shall mean any customer of [PDA] at any time prior to the date on which [Moss's] employment is terminated.

---

[1] The trial court referred to these items as "Advertising Specialty Items."

Pet'rs Ex. 2. As Vice President, Moss had access to confidential company information such as detailed customer spreadsheets, and he learned a great deal about PDA's sales operations and company practices.

One month later, however, Moss decided he wished to return to acting as an independent sales agent. In an email, he asked PDA to destroy the non-compete agreement he had signed, saying: "I have no intentions of selling apparel or promo[tions] through anyone else, but I want the non-compete that you had me sign destroyed. As an outside sales person, I cannot do a non-compete." Pet'rs Ex. 14. PDA declined to destroy the non-compete agreement. Despite this, Moss led PDA's President, Challen Powers, to believe that he would continue to act as PDA's sales agent.

Unbeknownst to Powers and other PDA employees, Moss had begun acting as a sales agent for another company, Priority Press (Priority).[2] Priority had not previously been engaged in the sort of promotional and apparel business that PDA was involved in. But shortly after Moss stepped down as PDA's Vice President, Priority expanded to include a promotional and apparel division. Moss facilitated this process by developing business and sales plans, and he was involved in selecting the new division's name— Priority Promotions. Tr. p. 59-60, 71.

Though Moss continued to do some work on PDA's behalf, he "allocated [his] time more toward the company that [he] thought was being loyal to [him]," Priority. *Id.* at 90-91. Moss informed PDA's customers that he was working for Priority, and he began offering Priority's products to them. *Id.* at 61-63. Moss encouraged PDA's

---

[2] Moss had been employed by Priority at some time in the past.

3

customers—including NextGear, one of PDA's largest customers—to work with him through Priority rather than PDA. *Id.* at 69, 86-88. He also opened new accounts for Priority using PDA's suppliers and vendors and disclosed information belonging to PDA. *Id.* at 59, 61.

When PDA learned what Moss was doing, it terminated its business relationship with him and sought a preliminary injunction against him in Marion Superior Court. At a hearing on PDA's motion, Moss argued that the non-compete agreement should not be enforced because PDA's President had previously "agreed to me not having to sign [such an agreement] in the first place." *Id.* at 44. Nonetheless, Moss admitted that he read the agreement, knew he was signing a non-compete agreement when he signed it, and had no questions about what he was signing. *Id.* at 38-39. He also conceded that he had never challenged the agreement's enforceability until now. *Id.* at 40.

After the hearing, the trial court ruled in PDA's favor, enjoining Moss from:

- "[D]irectly or indirectly call[ing] upon any customer of PDA for the purpose of soliciting or selling to such customer any Advertising Specialty Items . . . [and] sell[ing] any Advertising Specialty Items to any such PDA customer. The term PDA customer includes, without limitation, NextGear, and those entities affiliated with or related to NextGear."
- "[D]irectly or indirectly disclos[ing] to any person, firm or entity (collectively, 'Entity') the names, addresses, or telephone numbers of PDA customers for the purpose of enabling such Entity to solicit, sell to, or otherwise deal with any said customers with respect to Advertising Specialty Items."
- "[D]irectly or indirectly solicit[ing] or contact[ing] any PDA customer for the purposes related to the sale of Advertising Specialty Items."
- "[D]isclosing to any Entity confidential information of PDA . . . ."

Appellant's App. p. 13-14 (formatting altered). The court explained that:

4

The preliminary injunctive relief here sought simply requires Moss to not [] violate his contractual obligations. *Even with this injunction, he can sell printing and he can still earn a living from selling Advertising Specialty Items to the large market beyond PDA customers.* According to Moss, Priority has 4000 customers. The preliminary injunction will not prevent Moss from selling or dealing with parties other than PDA customers. Because his situation is self-imposed, and he freely entered into the non-competition arrangement, he promised not to sell or to take away customers surreptitiously and started selling for Priority while yet giving the impression to PDA that he was a sales agent for PDA. *The foreseeable loss to PDA in sales from NextGear alone for the next fourteen months is $600,000, while Moss's loss in commissions might be $60,000, less what he would have in the way of earnings from the extra ten to fifteen hours a week he would have by not selling to NextGear.* These facts all support injunctive relief.

*Id.* at 11 (emphases added).

In crafting its order, the court also struck a single provision in the non-compete agreement that read: "For purposes of this restriction of solicitation of customers of [PDA], the term 'customer' shall mean any customer of [PDA] at the time prior to the date on which [Moss's] employment is terminated." *Id.* at 12. The court noted that the "deletion d[id] not impair the enforceability of the balance of the agreement." *Id.* Finally, the court ordered PDA to pay a $100 dollar bond. *Id.* at 13.

Moss now appeals.

## Discussion and Decision

Moss contends that the trial court erred in granting PDA a preliminary injunction. He also argues that the trial court erred in ordering PDA to pay a $100 bond, which he claims is insufficient.

## I. Preliminary Injunction

5

The grant or denial of a request for a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was an abuse of that discretion. *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 171-72 (Ind. Ct. App. 2008) (citing *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 727 (Ind. 2008)). When determining whether to grant a preliminary injunction, the trial court is required to make special findings of fact and conclusions. *Id.* at 172. When findings and conclusions thereon are made, we must determine if the findings support the judgment. *Id.* We will reverse the judgment only when it is clearly erroneous; in other words, when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* We consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. *Id.* Moreover, "[t]he power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor." *Id.* (quotation omitted).

To obtain a preliminary injunction, the moving party has the burden of showing by a preponderance of the evidence the following: (1) a reasonable likelihood of success at trial; (2) the remedies at law are inadequate; (3) the threatened injury to the movant outweighs the potential harm to the nonmoving party from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction. *Id.* (citation omitted). If the movant fails to prove any of these requirements, the trial court's grant of an injunction is an abuse of discretion. *Id.* (citation omitted).

*A. Likelihood of Success at Trial*

6

Moss first contends that PDA failed to establish a reasonable likelihood of success at trial because the non-compete agreement is overbroad, and thus, unenforceable. He also argues that the trial court erred in utilizing the blue-pencil doctrine to cure this over-broadness. In its order granting the preliminary injunction, the trial court struck the last sentence of a portion of the non-compete agreement:

> [Moss] expressly agrees that at no time during [Moss's] employment, and for a period of two (2) years immediately following termination of said employment (such period called "The Applicable Period"), regardless of whether such termination is voluntary or involuntary, will he, for himself, or on behalf of any other person, persons, partnership, association, or corporation, call upon any customer of [PDA] for the purpose of soliciting or selling to such customer any services offered by [PDA]; nor will he in any way, directly or indirectly, for himself, or on behalf of any other person, persons, partnership, association, or corporation, solicit, divert, or take away any customer of [PDA] during the term of his employment or for two (2) years following termination of his employment. ~~For purposes of this restriction on solicitation of customers of [PDA], the term "customer" shall mean any customer of [PDA] at any time prior to the date on which [Moss's] employment is terminated.~~

This Court has held that while present customers are a protectable interest of an employer, a contract prohibiting contact with any past or future customers was vague and too broad. *Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d 772 (Ind. Ct. App. 2014) (citing *Search v. Richards, Dierterle & Co.*, 439 N.E.2d 208 (Ind. Ct. App. 1982)), *trans. denied*. Had the last sentence not been stricken, the agreement might have been overbroad and unenforceable—but the trial court used the blue-pencil doctrine to fix this problem.

If a court finds that portions of a non-compete agreement are unreasonable, it may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they have not made. *Gleeson*, 883 N.E.2d at 177 (citation omitted). But if such an agreement is clearly divisible into parts, and some parts

7

are reasonable while others are unreasonable, a court may enforce the reasonable portions only. *Id.* This process of striking unreasonable provisions from a covenant is known as "blue-penciling." *Id.* (citations omitted). "When applying the blue pencil, a court must not add terms that were not originally part of the agreement." *Id.* (citation omitted). Rather, "unreasonable restraints are rendered reasonable by scratching out any offensive clauses to give effect to the parties' intentions." *Id.* (quotation omitted).

Moss argues that the trial court impermissibly rewrote the parties' agreement when it struck the sentence above. Appellant's Br. p. 15. We disagree: the court struck a single sentence in the agreement that defined PDA's customers too broadly. The court added nothing to the agreement, and the other portions of the agreement are reasonable. What remains, after the redaction, are references to "customers" of PDA, which, under our precedent, can be reasonably interpreted to mean current customers—PDA's customers when Moss was terminated. *See Field v. Alexander & Alexander of Ind.*, 503 N.E.2d 627 (Ind. Ct. App. 1987) (holding that "any customer," in the absence of explicit language to the contrary, should be confined to the employer's customers when the employee was terminated), *reh'g denied, trans. denied*; *see also Standard Register Co. v. Cleaver*, 30 F. Supp. 2d 1084, 1097 (N.D. Ind. 1998) ("[Th]ere is an apparent presumption under Indiana law that a covenant restraining business with 'customers' concerns only those who are customers at the time of the employee's termination."). We conclude that the non-compete agreement is enforceable and the trial court did not err in blue-penciling it; thus, PDA established a reasonable likelihood of success at trial.[3]

---

[3] Moss also argues that the agreement is too broad because it includes NextGear, and his relationship with NextGear predated his work at PDA. Appellant's Br. p. 13. But PDA has a protectable

8

*B. Adequacy of Remedies at Law*

Moss next contends that the trial court erred in granting the preliminary injunction because an adequate remedy at law is available—a suit for money damages. Again, we disagree.

If an adequate remedy at law exists, injunctive relief should not be granted. *Gleeson*, 883 N.E.2d at 177-78 (citations omitted). The trial court has a duty to determine whether a legal remedy is as full and adequate as an equitable remedy. *Id.* (quotation omitted). A party who suffers mere economic injury is not entitled to injunctive relief because damages will be sufficient to make that party whole. *Id.* (citations omitted).

Here, the trial court found that "damages for Moss's conduct may not be easily provable as evidence as to repeat business may be uncertain." Appellant's App. p. 10. PDA presented evidence that Moss helped establish a division at Priority devoted to precisely the same work PDA performed. Moss then began offering Priority's products to PDA's clients, encouraging PDA's customers to work with him through Priority, opening new accounts for Priority using PDA's suppliers and vendors, and disclosing confidential information regarding PDA's customers. Yet beyond NextGear, it may be difficult for PDA to establish exactly what business would have gone to PDA if Moss had not done such things. As such, monetary damages are difficult to ascertain. *See Gleeson* 883 N.E.2d at 178 (citation omitted). And even if a specific dollar amount for PDA's lost business was calculable, thereby making a remedy at law sufficient, losses to PDA's

interest in its relationships with its customers, including NextGear, under Indiana law. And as established above, it sought to protect this interest via an enforceable non-compete agreement with Moss. Moss did not seek to exclude NextGear from the non-compete agreement.

good will as a result of Moss's violations of the agreement warrant a finding of irreparable harm. *See id.*

### C. Threatened Injury and Potential Harm

Moss contends that he is harmed more than PDA by the grant of the preliminary injunction. He argues that NextGear has stopped doing business with PDA and "could have terminated its business relationship with PDA at any time. Thus, PDA was never in a position to expect NextGear's continued business." Appellant's Br. p. 19. But there is no evidence in the record to support this claim, and it ignores the evidence that Moss encouraged NextGear to leave PDA and work with him at Priority, something the non-compete agreement prohibited him from doing.

As for Moss's additional claim that the injunction will cause him to lose a significant portion of his income, this is a self-imposed loss. That is, Moss freely entered into the non-compete agreement and promised not to compete with PDA, yet he ultimately made the decision to do so. Moss is not prohibited from recouping his losses, however: under the terms of the preliminary injunction, he is free to continue to use his sales experience to sell advertising specialty items to non-PDA customers. In the absence of a preliminary injunction, PDA would lose the benefits of the non-compete agreement, which, in turn, would threaten its business revenue and customer good will. Having weighed the threatened injury and potential for harm, we agree with the trial court's conclusion that the harm PDA would suffer if a preliminary injunction were denied exceeds the harm Moss would suffer if it were granted.

### D. Public Interest

10

Finally, there is no evidence that the preliminary injunction would disserve the public interest. In arguing the opposite, Moss characterizes the injunction as an attempt to punish him and coerce NextGear into doing business with PDA. *Id.* at 20. He claims this does a disservice to the "public's interest [in] competition." *Id.* This is not persuasive: as explained previously, Moss freely entered into the non-compete agreement and promised not to compete with PDA, yet he ultimately did so. Moss is not barred from competing in the sense that he may sell advertising specialty items to non-PDA customers. Likewise, NextGear is not prohibited from doing business with one of PDA's other competitors.

Because PDA proved the requirements for a preliminary injunction, the trial court did not abuse its discretion in granting the preliminary injunction against Moss.

## II. Bond

Moss also argues that the $100 bond is insufficient. We agree. In relevant part, Indiana Trial Rule 65(C) provides:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

"The reason for requiring security relates to the expeditious manner in which the preliminary injunctive relief is issued and to the lack of a full hearing upon the facts." *Barlow v. Sipes*, 744 N.E.2d 1, 11 (Ind. Ct. App. 2001) (citation omitted), *trans. denied*. "The fixing of the amount of the security bond is a discretionary function of the trial court and is reversible only for an abuse of that discretion." *Gleeson*, 883 N.E.2d at 181 (citation omitted). "When assessing the amount of security, the trial court should

11

consider not only the estimated damages offered by the parties but its own experience and knowledge." *Id.* (quotation omitted). "If security is warranted, the failure to require it does not render the injunction void; instead, the normal course is to remand for determination of sufficient bond." *Id.* (citation omitted).

Here, the trial court found that:

> The foreseeable loss to PDA in sales from NextGear alone for the next fourteen months is $600,000, while Moss's loss in commissions might be $60,000, less what he would have in the way of earnings from the extra ten to fifteen hours a week he would have by not selling to NextGear.

Appellant's App. p. 11. The size of the bond should approximate the damage the enjoined party will suffer if it is determined that the injunction was wrongfully entered. *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 95 (Ind. Ct. App. 2001) (citation omitted), *trans. denied*. One hundred dollars is simply insufficient based on the damages estimated in this case. We therefore remand for a determination of a proper bond.

Affirmed in part and remanded in part.

FRIEDLANDER, J., and MAY, J., concur.